QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Claude M. Stern (Bar No. 96737)
  Evette D. Pennypacker  (Bar No. 203515)
  Andrea Pallios Roberts (Bar No. 228128)
  Zachary M. Fabish (Bar No. 247535)
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California  94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100

Attorneys for Defendant Dassault Systèmes
SolidWorks Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AUTODESK, INC., a Delaware corporation,<br><br>               Plaintiff,<br><br>        vs.<br><br>DASSAULT SYSTÈMES SOLIDWORKS<br>CORPORATION, a Delaware corporation,<br><br>               Defendant. | CASE NO. 3:08-cv-04397-WHA<br><br>**DECLARATION OF ANDREA PALLIOS ROBERTS IN SUPPORT OF DASSAULT SYSTÈMES SOLIDWORKS CORPORATION'S OPPOSITIONS TO AUTODESK'S MOTIONS *IN LIMINE* NOS. 1-5** |

02966.51459/3253899.1

## DECLARATION OF ANDREA PALLIOS ROBERTS

I, Andrea Pallios Roberts, declare and state as follows:

1.      I am a member of the bar of the State of California and an associate with the Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Defendant Dassault Systèmes SolidWorks Corporation ("SolidWorks"). I make this declaration in support of SolidWorks' oppositions to Autodesk's motions *in limine,* nos. 1-5.  I make this declaration of personal knowledge; and if called and sworn as a witness, I could and would testify competently thereto.

### DEPOSITIONS AND DEPOSITION EXHIBITS

2.      Exhibit 1 is a true and correct copy of excerpts of the October 23, 2009, deposition of Ravi Dhar.

3.      Exhibit 2 is a true and correct copy of excerpts of the September 3, 2009, deposition of Chris Garcia.

4.      Exhibit 3 is a true and correct copy of excerpts of the June 25, 2009, deposition of Aaron Kelly.

5.      Exhibit 4 is a true and correct copy of excerpts of the October 20, 2009, deposition of Howard Marylander.

6.      Exhibit 5 is a true and correct copy of excerpts of the September 22, 2009, deposition of Robert Noftle.

7.      Exhibit 6 is a true and correct copy of excerpts of the September 18, 2009, deposition of Holly Stratford.

8.      Exhibit 7 is a true and correct copy of excerpts of the September 24, 2009, deposition of Robert Zuffante.

### OPPOSITION TO MOTION *IN LIMINE* NO. 1 RE: HOWARD MARYLANDER

9.      Exhibit 8 is a true and correct copy of the September 30, 2009 Report of Howard Marylander, including Exhibits A and B thereto.

### OPPOSITION TO MOTION *IN LIMINE* NO. 2 RE: PTO EVIDENCE

02966.51459/3253899.1

Case No. 3:08-cv-04397-WHA
ROBERTS DECLARATION IN SUPPORT OF SOLIDWORKS'
OPPOSITIONS TO AUTODESK'SMOTIONS *IN LIMINE* NOS. 1-5.

10.     Exhibit 9 is a true and correct copy of a PTO document revealing that Autodesk filed an opposition to DWGGATEWAY on May 12, 2006, produced by SolidWorks bearing control number SW0000392.

11.     Exhibit 10 is a true and correct copy of a Autodesk's Petition for Cancellation of DWGeditor, filed on September 2, 2006, and downloaded from http://ttabvue.uspto.gov/ttabvue/v?qs=78651779, on December 21, 2009.

12.     Exhibit 11 is a true and correct copy of a March 13, 2007, Response to Office Action in connection with its application to register DWG prepared by Autodesk and produced by Autodesk bearing control numbers ADSK0010283-87.

13.     Exhibit 12 is a true and correct copy of a September 4, 2007, Response to Office Action in connection with its application to register DWG prepared by Autodesk and produced by SolidWorks bearing control numbers SW0005224-39.

14.     Exhibit 13 is a true and correct copy of a May 12, 2008, Response to Office Action in connection with its application to register DWG prepared by Autodesk and produced by SolidWorks bearing control numbers SW0004847-74.

15.     Exhibit 14 are true and correct copies of excerpts of the United States Patent and Trademark Office's file with regard to Autodesk's application to register as a trademark DWG EXTREME, which were printed from the United States Patent and Trademark Office's website and previously submitted as Dkt. No. 100-2.

16.     Exhibit 15 are true and correct copies of excerpts of the United States Patent and Trademark Office's file with regard to Autodesk's application to register as a trademark DWG TRUEVIEW, which were printed from the United States Patent and Trademark Office's website and previously submitted as Dkt. No. 100-3.

17.     Exhibit 16 are true and correct copies of excerpts of the United States Patent and Trademark Office's file with regard to Autodesk's application to register as a trademark DWG TRUECONVERT, which were printed from the United States Patent and Trademark Office's website and previously submitted as Dkt. No. 100-4.

18.     Exhibit 17 is a true and correct copy of the TARR status of the Trademark Application for "Closed Loop Marketing," filed by The S Group, Inc. on August 28, 1998, with a record of the file history including office actions, and downloaded from http://tarr.uspto.gov/servlet/tarr?regser=serial&entry=74292104, on December 22, 2009.

19.     Exhibit 18 is a true and correct copy of the TARR status of the Trademark Application for "MOUNTAINGATE," filed by MountainGate Data Systems, Inc., on November 22, 1993, with a record of the file history including office actions, and downloaded from http://tarr.uspto.gov/servlet/tarr?regser=serial&entry=74434010, on December 22, 2009.

20.     Exhibit 19 is a true and correct copy of Autodesk's supplemental response to SolidWorks' Interrogatory No. 5.

**OPPOSITION TO MOTION *IN LIMINE* NO. 3 RE: AUTODESK AS A MONOPOLIST**

21.     Exhibit 20 is a true and correct copy of excerpts from the October 9, 2009, Expert Report of Professor Joel. N. Orr discussing the implications if Autodesk should win this lawsuit.

22.     Exhibit 21 is a true and correct copy of SolidWorks' response to Autodesk's Interrogatory No. 10.

23.     Exhibit 22 is a true and correct copy of excerpts of a Worldwide CAD Market Report, produced by Autodesk bearing control numbers ADSK0051002, 003, and 021, showing that Autodesk makes up 71% of the 2D CAD market.

**OPPOSITION TO MOTION *IN LIMINE* NO. 4 RE: POST-2005 & FOREIGN USE OF "DWG"**

24.     Exhibit 23 is a true and correct copy of printouts from http://www.staricad.com, last accessed on December 22, 2009.

25.     Exhibit 24 is a true and correct copy of printouts from http://www.dwgtool.com, last accessed on December 22, 2009.

26.     Exhibit 25 is a true and correct copy of printouts from http://www.easydwg.com, last accessed on December 22, 2009.

ROBERTS DECLARATION IN SUPPORT OF SOLIDWORKS'
OPPOSITIONS TO AUTODESK'S MOTIONS *IN LIMINE* NOS. 1-5.

1      I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct.  Executed December 22, 2009, at Redwood Shores, California.

3

4                                      By _____/s/   Andrea Pallios Roberts_____

5                                            Andrea Pallios Roberts
                                             Attorney for Defendant Dassault Systèmes
6                                            SolidWorks Corporation.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-                         Case No. 3:08-cv-04397-WHA
ROBERTS DECLARATION IN SUPPORT OF SOLIDWORKS'
OPPOSITIONS TO AUTODESK'SMOTIONS *IN LIMINE* NOS. 1-5.

# EXHIBIT 1

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3

4    AUTODESK, INC.,

5               Plaintiff,

6    vs.                              No. 3:08-CV-04397-WHA

7    DASSAULT SYSTEMES SOLIDWORKS
     CORPORATION,
8
                Defendant.
9

10

11

12    _____

13

14

15

16          Deposition of RAVI DHAR, Ph.D, Volume 1,

17    taken on behalf of Defendant, at 555 Twin Dolphin

18    Drive, Suite 560, Redwood Shores, California,

19    beginning at 9:11 a.m. and ending at 3:05 p.m., on

20    Friday, October 23, 2009, before Catherine A. Ryan,

21    Certified Shorthand Reporter No. 8239.

22

23

24

25

| | | |
|---|---|---|
| 09:11:52 | 1 | going off the record and gain concurrence from all |
| 09:11:55 | 2 | parties.  The videographer will then stop recording. |
| 09:11:58 | 3 | All recorded comments made by any party, attorney or |
| 09:12:01 | 4 | the deponent during this deposition will be assumed |
| 09:12:04 | 5 | to be on the record and will be transcribed. |
| 09:12:08 | 6 | Would counsel please identify yourselves |
| 09:12:09 | 7 | and state whom you represent? |
| 09:12:11 | 8 | MR. STONE:  Robert Stone of Quinn Emanuel |
| 09:12:13 | 9 | on behalf of the defendant. |
| 09:12:15 | 10 | MR. OVERSON:  Wesley Overson of Morrison & |
| 09:12:17 | 11 | Foerster on behalf of Plaintiff Autodesk. |
| 09:12:22 | 12 | MR. HUMPHREYS:  Lynn Humphreys, Morrison & |
| 09:12:24 | 13 | Foerster, on behalf of Autodesk. |
| 09:12:26 | 14 | THE VIDEOGRAPHER:  Would the court |
| 09:12:27 | 15 | reporter please swear in the witness? |
| 09:12:28 | 16 | RAVI DAHR, Ph.D. |
| 09:12:28 | 17 | _____ |
| 09:12:38 | 18 | having been administered an oath, was examined and |
| 09:12:38 | 19 | testified as follows: |
| 09:12:38 | 20 | EXAMINATION |
| 09:12:39 | 21 | BY MR. STONE: |
| 09:12:40 | 22 | Q.   Good morning, sir. |
| 09:12:40 | 23 | A.   Good morning. |
| 09:12:41 | 24 | Q.   Would you please state your full name and |
| 09:12:42 | 25 | spell your last name for the record? |

6

RAVI DHAR, PH.D.

11:37:16  1    licensing of characters and trademarks and so on,

11:37:18  2    but that's a little bit different, yeah.

11:37:19  3         Q.   Do you consider yourself an expert with

11:37:22  4    respect to any aspect of licensing?

11:37:25  5         A.   Any aspect, yes.   Some aspect -- the one I

11:37:28  6    just referred to, yeah.

11:37:33  7         Q.   But you're not employing any of that

11:37:35  8    expertise in connection with this case?

11:37:42  9         A.   Yeah, not specifically -- not specifically

11:37:44  10   in terms of what Autodesk licensing policy is.   I'm

11:37:48  11   just saying here is that if you see this name in

11:37:53  12   various other places, why that would -- in other

11:37:57  13   words, if they see the DWG name on other types of

11:38:00  14   products, why that might confuse the respondents

11:38:03  15   based -- given the definitions that Mr. --

11:38:06  16   Dr. Maryland has used, yeah.   That's all I'm saying.

11:38:09  17        Q.   But in terms of having any underlying

11:38:12  18   knowledge as to the circumstances in which Autodesk

11:38:14  19   does license its DWG technology, you really don't

11:38:18  20   know, correct?

11:38:24  21        A.   Yes.

11:38:24  22        Q.   You also suggest that Mr. Marylander's

11:38:28  23   definition of brand ignores fair use.

11:38:33  24        A.   That's right.

11:38:34  25        Q.   What is fair use?

116

| | |
|---|---|
| 11:38:37 | 1 |
| 11:38:40 | 2 |
| 11:38:42 | 3 |
| 11:38:48 | 4 |
| 11:38:51 | 5 |
| 11:38:58 | 6 |
| 11:38:59 | 7 |
| 11:39:00 | 8 |
| 11:39:01 | 9 |
| 11:39:03 | 10 |
| 11:39:04 | 11 |
| 11:39:06 | 12 |
| 11:39:08 | 13 |
| 11:39:12 | 14 |
| 11:39:15 | 15 |
| 11:39:16 | 16 |
| 11:39:18 | 17 |
| 11:39:21 | 18 |
| 11:39:22 | 19 |
| 11:39:25 | 20 |
| 11:39:26 | 21 |
| 11:39:38 | 22 |
| 11:39:40 | 23 |
| 11:39:46 | 24 |
| 11:39:49 | 25 |

A.   So, again, I'm not an expert on fair use. I have a layman's understanding, which is basically that your trademark can be used by others just to, you know, re-sell Chevrolet cars or, for example -- and -- but what all constitutes fair use, I don't have -- I don't have a full understanding of that, yeah.

Q.   You're not an expert with respect to fair use?

A.   Correct.

Q.   But you do understand that the fair use doctrine provides legal permission for one to use trademarks under certain circumstances?

A.   Yeah, I don't understand all the legal thing, but, yes, that it provides that, and that's right.   And my point here is really just that the respondent would not know that.   That's all I'm trying to say, yeah.

Q.   But fair use would be another permissive use, right?

A.   Correct.   At least, I should say, correct as based on my understanding.   I'm not a lawyer, yeah.

Q.   Dr. Dhar, were the results of Mr. Marylander's practice questions in line with

117

1            I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3            That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11            Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [   ] was [ N ] was not requested.

15            I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18            IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated:      NOV 1 0 2009

22

23                           _____
                        CATHERINE A. RYAN, RPR, RMR, CRR

24                          CSR NO. 8239

25

# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

Case No. 3:08-CV-04397-WHA

---

VIDEOTAPED DEPOSITION OF CHRIS GARCIA          

---

AUTODESK, INC., a Delaware corporation,

                              Plaintiff,

vs.

DASSAULT SYSTEMES SOLIDWORKS CORPORATION, a Delaware
corporation,

                              Defendant.

---

Thursday, September 3, 2009

9:42 a.m.

PURSUANT TO NOTICE and the California Rules of Civil
Procedure, the above-entitled deposition was taken on
behalf of Plaintiff at 370 17th Street, Suite 5200,
Denver, Colorado, before Denise A. Freeman, Registered
Professional Reporter and Notary Public within Colorado.



Patterson
Reporting & Video Service, Inc.

Highpoint • 2170 South Parker Road • Suite 263 • Denver, Colorado 80231
303.696.7680 • Fax: 303.696.7675
prvs@pattersonreporting.com

4

```
 1                    P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  We are on the record at
 3     approximately 9:42 a.m. on September 3, 2009.  This is
 4     the videotape deposition of Christopher Garcia in the
 5     matter of Autodesk versus Dassault Systemes SolidWorks,
 6     Case No. 3:08-CV-04397-WHA.
 7              We are located at 370 17th Street, Denver,
 8     Colorado.  The court reporter is Denise Freeman from the
 9     firm of Patterson Reporting & Video.  My name is
10     Candesia Reiff from the same firm.
11              Would counsel please introduce themselves
12     for the record.
13              MR. MELAUGH:  David Melaugh from Morrison &
14     Foerster representing plaintiff Autodesk.
15              MS. PENNYPACKER:  Evette Pennypacker from
16     Quinn Emanuel representing third-party Chris Garcia and
17     defendant and counterclaimant.
18              THE VIDEOGRAPHER:  Would the court reporter
19     please swear in the deponent.
20                    CHRIS GARCIA,
21     having been first duly sworn, was examined and
22     testified as follows:
23                    EXAMINATION
24     BY MR. MELAUGH:
25         Q.   Good morning, Mr. Garcia.
```

1    at the next sentence.  We are still on the paragraph

2    that begins, "Name of the Legacy Editor."

3                Now it looks as though Bob Zuffante has a

4    comment at the end of this paragraph.  It reads,

5    "DWGedit is fine with me.  You should check with Holly

6    to make sure it's okay to use, quote, DWG, end quote,

7    L."

8                Do you know who the Holly is he's referring

9    to here?

10               MS. PENNYPACKER:  Foundation.

11        A.    I only knew one Holly, so that would be our

12    legal internal lawyer.

13        Q.    (BY MR. MELAUGH) Why would it have been

14    important, if you know, to check with Holly to make sure

15    it's okay to use DWG?

16               MS. PENNYPACKER:  Foundation.

17        A.    Probably all names that we used would have

18    gone to Holly to see if we could use them.

19        Q.    (BY MR. MELAUGH) Was that your standard

20    practice, in fact, over the time you were at SolidWorks,

21    to check product names with Holly or someone else at

22    legal before they were released?

23        A.    Yes.

24        Q.    Why was that the practice at SolidWorks?

25               MS. PENNYPACKER:  Foundation.

1        A.    It was the practice at every company I was

2    at.   You don't put a name on something until you make

3    sure it's usable.

4        Q.    (BY MR. MELAUGH) What do you mean by

5    "usable"?

6        A.    Not trademarked.

7        Q.    Are there other reasons that you know of why

8    a name might not be usable?

9              MS. PENNYPACKER:    Vague.

10       A.    No.    Just trademarks.

11       Q.    (BY MR. MELAUGH) Do you know whether anyone,

12   in fact, checked with Holly to make sure it's okay to

13   use DWG?

14       A.    I don't know.

15             (Deposition Exhibit 50 was marked.)

16       Q.    (BY MR. MELAUGH) I am showing you what's

17   been marked as Exhibit 50.    It is another e-mail that

18   looks like it's been printed by Holly Stratford or from

19   Holly Stratford.    It's an e-mail sent from Bob Noftle to

20   a number of folks.    You were on the cc list.

21             And then it attaches a file that looks like

22   it's labeled, "DWGeditor ECT -- November 11."    The

23   e-mail itself is dated November 13, 2003.

24       A.    Okay.

25       Q.    First I have a couple of questions about the

141

STATE OF COLORADO)

　　　　　　　　　　) SS.   REPORTER'S CERTIFICATE

COUNTY OF DENVER )

　　　I, Denise A. Freeman, do hereby certify

that I am a Registered Professional Reporter and

Notary Public within the state of Colorado; that

previous to the commencement of the examination,

the deponent was duly sworn by me to testify to the

truth.

　　　I further certify that this deposition was

taken in shorthand by me at the time and place herein

set forth and was thereafter reduced to typewritten

form, and that the foregoing constitutes a true and

correct transcript.

　　　I further certify that I am not related

to, employed by, nor of counsel for any of the parties

or attorneys herein, nor otherwise interested in the

result of the within action.  I further certify reading

and signing not requested pursuant to CRCP Rule 30(e).

　　　In witness whereof, I have affixed my

signature this 10th day of September, 2009.

　　　　　　　　　　Denise A. Freeman

　　　　　　　　　PATTERSON REPORTING & VIDEO
　　　　　　　　　　Denise A. Freeman
　　　　　　　Registered Professional Reporter
　　　　　　　　　and Notary Public


　　　　　　　　Patterson Reporting & Video
　　　　303-696-7680  prvs@pattersonreporting.com

# EXHIBIT 3

CONFIDENTIAL - ATTYS' EYES ONLY

1        UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4

5   AUTODESK, INC., a Delaware

6   corporation,                          Case No.

7        Plaintiff,              3:08-cv-04397-WHA

8   v.

9   DASSAULT SYSTEMES SOLIDWORKS

10  CORPORATION, a Delaware corporation,

11       Defendant.

12  ----------------------------------- x

13        CONFIDENTIAL - ATTORNEYS' EYES ONLY

14       RULE 30(b)(6) VIDEOTAPED DEPOSITION OF

15   DASSAULT SYSTEMES SOLIDWORKS CORPORATION

16             AARON KELLY, Designee

17            Thursday, June 25, 2009

18                 9:01 a.m.

19             Proskauer Rose LLP

20           One International Place

21            Boston, Massachusetts

22

23  Reporter:   Dana Welch, CSR, RPR, CRR, CCP

               Certified LiveNote Trainer

24

25

                                           Page 1

CONFIDENTIAL - ATTYS' EYES ONLY

| | | |
|---|---|---|
| 1 | P R O C E E D I N G S | 08:44:20 |
| 2 | THE VIDEOGRAPHER:  We are on the record. | 08:44:20 |
| 3 | This is the video operator speaking, Shawn | 09:01:04 |
| 4 | Budd.  Today's date is June 25th, 2009 and the | 09:01:06 |
| 5 | time is one minute after 9:00. | 09:01:10 |
| 6 | We are here at Proskauer Rose located in | 09:01:12 |
| 7 | Boston, Massachusetts to take the videotaped | 09:01:15 |
| 8 | deposition of Aaron Kelly in the matter of | 09:01:17 |
| 9 | Autodesk, Inc. versus Dassault Systemes | 09:01:21 |
| 10 | SolidWorks Corporation. | 09:01:24 |
| 11 | Would counsel please introduce themselves. | 09:01:24 |
| 12 | MR. JACOBS:  Michael Jacobs, Morrison & | 09:01:27 |
| 13 | Foerster, counsel for Autodesk. | 09:01:28 |
| 14 | MS. BOS:  Jacqueline Bos, Morrison & | 09:01:30 |
| 15 | Foerster, counsel for Autodesk. | 09:01:34 |
| 16 | MS. TURBIS:  Lisa Turbis, in-house counsel | 09:01:37 |
| 17 | for Autodesk. | 09:01:38 |
| 18 | MR. STERN:  Claude Stern of Quinn Emanuel | 09:01:40 |
| 19 | on behalf of SolidWorks. | 09:01:41 |
| 20 | MR. NEIL:  Mark Neil, in-house counsel for | 09:01:43 |
| 21 | SolidWorks. | 09:01:46 |
| 22 | THE VIDEOGRAPHER:  And would the court | 09:01:47 |
| 23 | reporter please swear in the witness. | 09:01:56 |
| 24 | | |
| 25 | | |

Page 6

CONFIDENTIAL - ATTYS' EYES ONLY

| | | |
|---|---|---|
| 1 | AARON KELLY, Rule 30(b)(6) designee | 09:01:56 |
| 2 | of SolidWorks Corporation, sworn | 09:01:56 |
| 3 | EXAMINATION | 09:01:56 |
| 4 | BY MR. JACOBS: | 09:01:57 |
| 5 | Q. Good morning, Mr. Kelly. | 09:01:57 |
| 6 | A. Good morning. | 09:01:59 |
| 7 | Q. You've had your deposition taken before. | 09:02:00 |
| 8 | A. I've had one before, yes. | 09:02:02 |
| 9 | Q. That was in the trademark trial and appeal | 09:02:03 |
| 10 | board matter between Autodesk and SolidWorks? | 09:02:07 |
| 11 | A. Yes. | 09:02:09 |
| 12 | Q. Have you had a chance to review the | 09:02:09 |
| 13 | transcript in that matter? | 09:02:11 |
| 14 | A. I quickly reviewed it, yeah, this week. | 09:02:13 |
| 15 | Q. Did you see any testimony that you gave | 09:02:15 |
| 16 | there that in retrospect you found incorrect or | 09:02:17 |
| 17 | required amendment? | 09:02:20 |
| 18 | A. No, I didn't notice anything. | 09:02:21 |
| 19 | Q. I'm going to hand -- I'm going to ask the | 09:02:23 |
| 20 | court reporter to mark and hand you the deposition | 09:02:25 |
| 21 | notice for this deposition. | 09:02:28 |
| 22 | A. All right. | 09:02:38 |
| 23 | (Exhibit 1, Plaintiff Autodesk, Inc.'s | 09:02:38 |
| 24 | Notice of Deposition of Dassault Systemes | 09:02:38 |
| 25 | SolidWorks Corporation, marked for | 09:02:38 |

Page 7

CONFIDENTIAL - ATTYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q. Would you be aware, have you checked, have | 03:04:50 |
| 2 | you looked at the documents? | 03:04:53 |
| 3 | A. We -- we -- I asked her yesterday that | 03:05:08 |
| 4 | question and she couldn't find anything. So the | 03:05:11 |
| 5 | answer I guess is we don't recall, but there's | 03:05:15 |
| 6 | nothing -- there's no documents that say we did. | 03:05:20 |
| 7 | Q. And did Holly respond in writing as to her | 03:05:23 |
| 8 | view in answering the question? | 03:05:31 |
| 9 | A. I don't know if she did. | 03:05:33 |
| 10 | Q. Have you looked? | 03:05:35 |
| 11 | A. I asked her yesterday if -- if she did, | 03:05:37 |
| 12 | and she said, yes, that it was okay to do DWG. She | 03:05:45 |
| 13 | looked at Autodesk's website to see if there was a | 03:05:50 |
| 14 | trademark; there was not. She also noticed that | 03:05:54 |
| 15 | there was many DWG files already -- files -- DWG | 03:05:58 |
| 16 | products out there in the marketplace already. So | 03:06:02 |
| 17 | we went with DWGeditor. | 03:06:10 |
| 18 | Q. So her -- her advice was it was | 03:06:11 |
| 19 | permissible to use DWG as a name? | 03:06:16 |
| 20 | MR. STERN: Again, without waiving any | 03:06:19 |
| 21 | attorney/client privilege. | 03:06:21 |
| 22 | MR. JACOBS: Well, now I think the witness | 03:06:23 |
| 23 | did just go into what she did and what she | 03:06:24 |
| 24 | reported. | 03:06:26 |
| 25 | MR. STERN: I thought we agreed what he | 03:06:26 |

| | | |
|---|---|---|
| 1 | Stratford's conclusion that it was okay to use DWG? | 03:09:53 |
| 2 | MR. STERN: No foundation. | 03:10:01 |
| 3 | A. I think I said that Holly looked -- she | 03:10:03 |
| 4 | told me she looked at Autodesk's website, looked at | 03:10:07 |
| 5 | their trademarks, it wasn't there. She looked on | 03:10:12 |
| 6 | the Internet and saw that there were many DWG named | 03:10:15 |
| 7 | products out there. | 03:10:19 |
| 8 | I think that's really all. I said I don't | 03:10:23 |
| 9 | know if she told anybody that it's okay. I'm | 03:10:27 |
| 10 | making the conclusion that we don't see a problem | 03:10:33 |
| 11 | and that's why we went ahead with it. | 03:10:37 |
| 12 | Q. So she didn't -- you don't actually know | 03:10:39 |
| 13 | as you it is here what her answer was to the | 03:10:42 |
| 14 | question. | 03:10:45 |
| 15 | A. I do not. | 03:10:45 |
| 16 | Q. You know that she looked at the Autodesk | 03:10:46 |
| 17 | website. | 03:10:48 |
| 18 | A. I do. | 03:10:48 |
| 19 | Q. You know that she -- and I take it that | 03:10:49 |
| 20 | what you're saying is she looked at the website to | 03:10:52 |
| 21 | see whether Autodesk was claiming DWG as a | 03:10:59 |
| 22 | trademark? | 03:11:01 |
| 23 | A. Yes. | 03:11:02 |
| 24 | Q. Is that what she conveyed to you? | 03:11:02 |
| 25 | A. Yes. | 03:11:04 |

| | | |
|---|---|---|
| 1 | Q. And that she was aware that there were | 03:11:05 |
| 2 | other products named DWG or became aware. | 03:11:07 |
| 3 | A. Yes. | 03:11:10 |
| 4 | Q. And you are not now answering the question | 03:11:11 |
| 5 | -- you don't know the answer to the question as you | 03:11:16 |
| 6 | it is here what her advice was based on that. | 03:11:18 |
| 7 | A. Correct. | 03:11:20 |
| 8 | Q. But the company went ahead and used DWG in | 03:11:21 |
| 9 | the name. The company was not in the habit of | 03:11:28 |
| 10 | disregarding advice from counsel, and therefore, | 03:11:32 |
| 11 | you're inferring that the green light was given. | 03:11:36 |
| 12 | A. I'd say it's -- it's not our policy to | 03:11:39 |
| 13 | ignore the advice of counsel. | 03:11:46 |
| 14 | Q. And you are inferring from that | 03:11:48 |
| 15 | constellation of facts that the green light was | 03:11:51 |
| 16 | given by Holly, which I do not regard as a waiver. | 03:11:53 |
| 17 | Actually, let me change the question a | 03:12:04 |
| 18 | little bit. | 03:12:06 |
| 19 | A. Please. | 03:12:06 |
| 20 | Q. Did Holly give any cautionary advice to | 03:12:07 |
| 21 | the company suggesting that it might not be such a | 03:12:11 |
| 22 | good idea to use DWG in the name? | 03:12:17 |
| 23 | A. I'm not aware of that, no. | 03:12:20 |
| 24 | Q. And would you be aware of that if it | 03:12:21 |
| 25 | occurred? | 03:12:24 |

```
 1                    CERTIFICATE
 2    Commonwealth of Massachusetts
 3    Suffolk, ss.
 4
 5         I, Dana Welch, Registered Professional
 6    Reporter, Certified Realtime Reporter and Notary
 7    Public in and for the Commonwealth of
 8    Massachusetts, do hereby certify that AARON KELLY,
 9    Rule 30(b)(6) designee for Dassault Systemes
10    SolidWorks Corporation, the witness whose
11    deposition is hereinbefore set forth, was duly
12    sworn by me and that such deposition is a true
13    record of the testimony given by the witness.
14         I further certify that I am neither related
15    to nor employed by any of the parties in or counsel
16    to this action, nor am I financially interested in
17    the outcome of this action.
18         In witness whereof, I have hereunto set my
19    hand and seal this 3rd day of July, 2009.
20
21                    _____
                      Dana Welch
22                    Notary Public
                      My commission expires:
23                    October 22, 2010
24
25
```

# EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--


AUTODESK, INC., a Delaware
corporation,


            Plaintiff,


      vs.                          No. 3:08-CV-04397-WHA


DASSAULT SYSTÈMES SOLIDWORKS
CORPORATION, a Delaware
corporation,            **CERTIFIED**
                        **COPY**

            Defendants.

_____/


VIDEOTAPED DEPOSITION OF

HOWARD MARYLANDER

_____

October 20, 2009


REPORTED BY:   WENDY E. ARLEN, CSR #4355, CRR, RMR
JOB 423804

**M E R R I L L   C O R P O R A T I O N**

135 Main Street, 4th Floor                    415.357.4300 Tel
San Francisco, CA 94105

www.merrillcorp.com

HOWARD MARYLANDER   October 20, 2009

```
 1                    San Francisco, California
 2                    Tuesday, October 20, 2009
 3                          9:01 a.m.
 4                          --oOo--
 5            VIDEOGRAPHER:   Here begins Volume I,
 6    videotape number one in the deposition of Howard
 7    Marylander in the matter of Autodesk, Inc., versus
 8    Dassault Systèmes SolidWorks Corporation in the
 9    United States District Court, Northern District of
10    California, San Francisco Division, Case No.
11    3:08-CV-04397-WHA.
12            Today's date is October 20th, 2009.  The time
13    on the video monitor 9:01.  The video operator today
14    is Ted Hoppe, a notary public contracted by Merrill
15    Legal Solutions, San Francisco, California.  This
16    videotaped deposition is taking place at 425 Market
17    Street in San Francisco.
18            Counsel, could you please voice identify
19    yourselves and state whom you represent.
20            MR. JACOBS:   Michael Jacobs from Morrison &
21    Foerster for Autodesk.  With me is Lynn Humphreys
22    from Morrison & Foerster.
23            MR. STERN:   Claude Stern of Quinn Emanuel on
24    behalf of Dassault Systèmes SolidWorks.
25            VIDEOGRAPHER:   The court reporter today is
```

08:59
09:00
09:01
09:01
09:01

4

```
 1      Wendy Arlen of Merrill Legal Solutions.
 2                  Wendy, could you please swear the witness in?
 3                          --oOo--
 4                  HOWARD MARYLANDER,
 5      a witness called by the Plaintiff, after being duly
 6      sworn, testified as follows:
 7                          --oOo--
 8                  VIDEOGRAPHER:  Please proceed.
 9                  EXAMINATION BY MR. JACOBS
10      Q.      Good morning, Dr. Marylander.
11      Mr. Marylander.
12      A.      Good morning.
13      Q.      Good morning, Mr. Marylander.
14              You did a survey for this case, correct?
15      A.      Correct.
16      Q.      And that's in your September 30, 2009,
17      report.
18      A.      Yes.
19      Q.      Do you have that report in front of you?
20      A.      I have my copy, yes.
21              MR. STERN:  I don't know if the witness has
22      the full copies of everything, but the witness
23      brought his copies.  That's fine.  I just want to
24      make sure.
25      Q.      MR. JACOBS:  If you don't have something, let
```

                                                                    5

1    us know.

2    A.          I will.

3    Q.          The topic of your September 30, 2009, expert

4    report is whether DWG is generic; is that correct?

09:02    5    A.          No, specifically the topic is whether DWG is

6    a brand name.

7    Q.          What's the opposite of a brand name?

8    A.          A generic, but you asked what the purpose of

9    was.  My stated objectives are to determine whether

09:02    10   it's a brand name.

11   Q.          What do you -- what do you mean by a brand

12   name in your report?

13   A.          A name that is used by a single source or

14   somebody that that single source authorizes or

09:02    15   approves.

16   Q.          And what do you understand -- what did you

17   mean by a generic name in your report?

18   A.          A name that doesn't have those

19   characteristics, can be used by anybody.  If you

09:03    20   would like, I can read the actual definitions that

21   were given to respondents.

22   Q.          That's actually where I was going is whether

23   the definitions you were giving to respondents for

24   the survey coincide with what you understand a

09:03    25   generic name and brand name to mean.

6

Merrill Legal Solutions
(800) 869-9132

```
          1    A.        Yes.

          2    Q.        Your -- you chose it as a control for common,

          3    right?

          4    A.        Yes.

10:46     5    Q.        But your respondents didn't understand it --

          6    by a two-thirds majority, those who thought they knew

          7    thought it was a brand name.

          8    A.        But not very many knew.

          9    Q.        So are you now going with the don't knows

10:47    10    matter?

         11    A.        I'm not changing my opinion.  Don't knows, in

         12    my opinion, matter a great deal.

         13    Q.        Well, let's go back to 18.

         14    A.        Okay.  You were the one who said let's

10:47    15    exclude the don't knows.

         16    Q.        I thought you thought you should exclude

         17    them.

         18    A.        No.  No.

         19    Q.        Let's go to 18.  Of your respondents,

10:47    20    17 percent said that IGES was a common name and

         21    33 percent said it was a brand name, correct?

         22    A.        Correct.

         23    Q.        You chose it as a control for common name.

         24    A.        Yes.

10:47    25    Q.        Why do you believe it was a suitable control
```

                                                                     70

1       in light of the number of people who thought it was a

2       brand name?

3       A.      I -- first of all, I don't pass judgment on

4       the suitability of a control based on the answers

10:47   5       that come after the fact.  The suitability of the

6       control is determined by its representativeness of

7       the industry prior to the survey.  So -- so

8       regardless of the answers, that -- that doesn't

9       affect my decision on using it as a control.

10:48   10      Second, what we look at -- well, three

11      points.  That was the first.  The second is what we

12      look at is the pattern for DWG relative to the

13      pattern for the common and brand names.  So

14      regardless of whether people are predisposed to think

10:48   15      of something correctly or incorrectly, the pattern is

16      usually the most meaningful way.  So what we do, what

17      I do and many others is compare the pattern for DWG

18      against the average of the three.

19      Third, in my mind, a don't know response is

10:48   20      very clearly evidence of a lack of brand

21      identification.

22      Q.      So the first point you said is -- the first

23      point you made is that you choose them based on their

24      representativeness.

10:49   25      A.      Of the industry.

71

<table>
<tr><td></td><td>1</td><td>Q.      How do you know these are representative of</td></tr>
<tr><td></td><td>2</td><td>the industry?</td></tr>
<tr><td></td><td>3</td><td>A.      I -- I relied on the two experts with whom I</td></tr>
<tr><td></td><td>4</td><td>spoke.</td></tr>
<tr><td>10:49</td><td>5</td><td>Q.      And so you have no testimony to offer on why</td></tr>
<tr><td></td><td>6</td><td>they might be representative other than your --</td></tr>
<tr><td></td><td>7</td><td>A.      Not beyond what I just said.</td></tr>
<tr><td></td><td>8</td><td>Q.      Other than your reliance on them?</td></tr>
<tr><td></td><td>9</td><td>A.      That's correct.</td></tr>
</table>

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | Q.      How do you know these are representative of    |
|       | 2  | the industry?                                          |
|       | 3  | A.      I -- I relied on the two experts with whom I   |
|       | 4  | spoke.                                                 |
| 10:49 | 5  | Q.      And so you have no testimony to offer on why   |
|       | 6  | they might be representative other than your --        |
|       | 7  | A.      Not beyond what I just said.                   |
|       | 8  | Q.      Other than your reliance on them?              |
|       | 9  | A.      That's correct.                                |
| 10:49 | 10 | Q.      And then the second point is the pattern of    |
|       | 11 | DWG relative to the pattern for the common and brand   |
|       | 12 | names.  We'll come back to that.  And then the third   |
|       | 13 | point is that don't know is evidence of a lack of      |
|       | 14 | brand identification, right?                           |
| 10:49 | 15 | A.      I believe so.                                  |
|       | 16 | Q.      That's what you believe.  It could also be     |
|       | 17 | evidence of confusion in light of your instructions?   |
|       | 18 | A.      Not -- not if we -- let me, if you don't       |
|       | 19 | mind, briefly review.  As I saw it, the whole          |
| 10:49 | 20 | structure of Dr. Dhar's arguments were these.  One, I  |
|       | 21 | interviewed -- by poor qualifications, interviewed     |
|       | 22 | secretaries and secretarial assistants.                |
|       | 23 | Second, these poor people were confused               |
|       | 24 | tremendously by these definitions that I gave; and,    |
| 10:50 | 25 | third, as a result, we got all this don't know.        |

Merrill Legal Solutions
(800) 869-9132

|       |    |                                                      |
|-------|----|------------------------------------------------------|
|       | 1  | That's his logic sequence.                           |
|       | 2  | In my opinion, the evidence in the study             |
|       | 3  | showed I didn't interview the wrong people.  Based on|
| 10:50 | 4  | the practice interviews, the comprehension of the    |
|       | 5  | questions were quite accurate, which leads us to a   |
|       | 6  | different conclusion.  The I don't know is because   |
|       | 7  | these people, even though they use CAD, aren't       |
|       | 8  | experts on all these systems.  And there is no reason|
| 10:50 | 9  | why a guy at a five-person company who's designing   |
|       | 10 | something should be an expert on file formats.       |
|       | 11 | So -- so that there was such a high don't            |
|       | 12 | know is a meaningful finding and not evidence of a   |
|       | 13 | fraud.                                               |
| 10:51 | 14 | To take it one step further, and I'll be             |
|       | 15 | quiet and you can respond.                           |
|       | 16 | Q.      No, go ahead.                                |
|       | 17 | A.      To use Dr. Dhar's reasoning, if on its face I|
|       | 18 | don't know means flawed study design, how could you  |
| 10:51 | 19 | ever measure a subject where people don't know?  By  |
|       | 20 | definition your study would be flawed.  So you could |
|       | 21 | only do studies which gave you findings that         |
|       | 22 | everybody was very knowledgeable.                    |
|       | 23 | Q.      It's possible that representativeness has    |
| 10:51 | 24 | multiple meanings here, correct?  Let me be more     |
|       | 25 | specific.  IGES may be representative in the sense   |

73

```
 1    more than half of the control terms.  Do you have
 2    a -- and, therefore, he believes that this is a basic
 3    flaw in the study design in your survey.  What's your
 4    reaction to that?
 5    A.     My reaction is that he has not identified
 6    any -- to my satisfaction any flaws in the study
 7    design, and so I'm comfortable concluding that that's
 8    the way the real world is, not that this is a flawed
 9    study.
10    Q.     And then you just disagree with Dr. Dhar
11    about how don't knows should be classified because
12    you think the -- a don't know should be not --
13    actually supports genericness.
14    A.     Yes, but to be specific, the purpose of my
15    survey -- and you can read it in the study
16    objectives -- is to determine whether DWG is a brand
17    name.  If somebody doesn't know whether or not it's a
18    brand name, one cannot conclude that it's a brand
19    name.
20    Q.     And, therefore, it's actually -- and you're
21    being very precise here.  It's not to determine
22    whether DWG is generic.  It's to determine whether
23    it's a brand name.
24    A.     That's my stated objective.
25    Q.     There could be -- there may be a missing
```

11:06 (line 5)
11:07 (line 10)
11:07 (line 14/15)
11:07 (line 20)
11:07 (line 25)

85

```
 1      category here.

 2      A.        I want to remind you -- I am 99 percent sure

 3      of what I'm going to say, not a hundred.  At the very

 4      beginning when you were talking to me, you said,

 5      well, if it's not a brand, it must be generic or you

 6      said the reverse of that, implicitly recognizing

 7      there are only two categories.

 8      Q.        But that's my question.

 9      A.        But that was your statement.

10      Q.        But, now, that was -- my statements are not

11      evidence.  The judge will so instruct the jury.

12                My question to you is is it possible there's

13      a third category.

14      A.        I don't -- let me -- let me pause to think

15      for a moment.  My personal opinion, and, you know, if

16      that's what you're asking, is that genericness is the

17      default category.  Unless you can demonstrate

18      something's a brand, it's generic.

19      Q.        So that's why I asked you if your view would

20      be changed if you had a set of documents in front of

21      you that report that DWG is Autodesk's proprietary

22      file format.  They go on to report, just to expand

23      the hypothetical, they go on to report that various

24      third parties seek to provide compatibility with

25      Autodesk's DWG file format, but when they're using
```

11:08
11:08
11:08
11:09
11:09

86

```
 1    DWG, they are using it to refer to a specific file
 2    format that has been developed and enhanced by
 3    Autodesk over time, but that others have tried to
 4    reverse engineer and emulate.
 5            So setting that up as the hypothetical, would
 6    that affect your opinion now more particularly on
 7    this question of what is the default?
 8    A.        No, I've done brand work for almost 50 --
 9    45 years, and the absence of brand recognition in the
10    commercial world is -- they don't use the term
11    genericness, but the absence of brand recognition,
12    whether it's a don't know or whether it's confusion
13    with other brands or some kind of vagueness, is
14    always considered the equivalent, the commercial
15    equivalent of genericness.
16    Q.        Is it possible for Dr. Jay's survey and your
17    survey, for a secondary meaning survey and your
18    survey to both be valid?
19    A.        It is -- let me qualify it.  I think
20    Dr. Jay's survey was poorly done, and I outlined
21    that.  Let's put aside -- let's suppose it was
22    perfectly done and she got her findings and I got
23    mine.
24    Q.        Yes.
25    A.        I would say on its face it's possible.
```

11:09  5
11:09  10
11:10  15
11:10  20
11:10  25

           1    A.      I do.

           2    Q.      That came from counsel, correct?

           3    A.      Correct.

           4    Q.      On page 16 where you discuss the practice
11:48      5    questions.

           6    A.      Yes.

           7    Q.      There was no filtering done after those

           8    questions, correct, of survey respondents?  You did

           9    not exclude survey respondents who got the practice
11:49     10    questions wrong.

          11    A.      No, that's the one area where I disagree with

          12    the traditional Teflon study, especially when we're

          13    talking with people with responsibility in industry.

          14    I -- I don't think there should be an IQ test.

11:49     15    Q.      In your -- withdrawn.

          16            I just noted that your survey was done and

          17    ended on September 2nd, right?  It says that in your

          18    report.

          19    A.      Okay.

11:50     20    Q.      The study took place from August 18th through

          21    September 2nd.

          22    A.      If that's what it said, I accept that.

          23    Q.      How did you get it done in 12 business days?

          24    Did you have to do anything by way of beefing up the
11:50     25    number of interviewers or otherwise?

                                                                  110

# CERTIFICATE OF REPORTER

I, WENDY E. ARLEN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision.

That before completion of the deposition, review of the transcript [ ] was [X] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition nor in any way interested in the event of this cause and that I am not related to any of the parties thereto.

DATED: _October 27_, 2009.


_____Wendy E Arlen_____

WENDY E. ARLEN CSR, No. 4355

# EXHIBIT 5

1

VOLUME I                                          Pages 1 - 172

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


- - - - - - - - - - - - - - - - x

AUTODESK, INC.,

                    Plaintiff,              Case No.:

        vs.                                 308-CV-04397-WHA

DASSAULT SYSTÈMES SOLIDWORKS

CORPORATION,

                    Defendant.

- - - - - - - - - - - - - - - - x



VIDEOTAPED DEPOSITION OF ROBERT NOFTLE


22 September 2009

9:35 a.m.


Esquire Deposition Solutions

99 Summer Street

Boston, Massachusetts


Jane M. Borrowman, RPR



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.770.3363
Facsimile: 415.591.3335

Suite 1100
44 Montgomery Street
San Francisco, CA 94104
www.esquiresolutions.com

5

1    With me is Jacqui Bos from Morrison & Foerster

2    and Lisa Turbis, corporate counsel at

3    Autodesk.

4            MS. ROBERTS:   Andrea Pallios Roberts

5    for defendant, Dassault Systèmes SolidWorks

6    Corporation, and with me is Mark Neil,

7    corporate counsel for Systèmes.

8            VIDEOGRAPHER:   Thank you.

9            Will the court reporter please swear

10    in the witness.

11            ROBERT NOFTLE,

12    having been satisfactorily identified by the

13    production of his driver's license, and duly

14    sworn by the Notary Public, was examined and

15    testified as follows:

16            EXAMINATION

17  BY MR. JACOBS:

18  Q.    Good morning, Mr. Noftle.

19  A.    Good morning.

20  Q.    You drove from --

21  A.    Wilton, New Hampshire.

22  Q.    How far is that away?

23  A.    About 55 miles.

24  Q.    What time did you leave this morning?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.770.3363
Facsimile: 415.591.3335

Suite 1100
44 Montgomery Street
San Francisco, CA 94104
www.esquiresolutions.com

51

```
 1        let's say, DXF or DWG, we could open it.
 2   Q.   But the intent of DWGeditor was to message to
 3        customers "we can open DWG format files,"
 4        wasn't it?
 5   A.   Yes.
 6   Q.   Now, Mr. Zuffante says "DWGedit," he changes
 7        your recommendation a little bit, "is fine
 8        with me.  You should check with Holly to make
 9        sure it's okay to use DWG at all."
10             Do you see that?
11   A.   Uh-huh.
12   Q.   Did you check with Holly?
13   A.   I'm assuming I did because of the -- whenever
14        naming -- there was a -- my belief was that
15        there was a -- there's a naming process that
16        you go through.  I was a -- I was not involved
17        in marketing or really naming products, so I
18        did not have the final vote on the name and
19        there was a process of due diligence that any
20        number of different people would have had
21        input on.
22   Q.   So -- and Holly is Holly Stratford, correct?
23   A.   Correct.
24   Q.   She was the general counsel of SolidWorks?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.770.3363
Facsimile: 415.591.3335

Suite 1100
44 Montgomery Street
San Francisco, CA 94104
www.esquiresolutions.com

52

1    A.    Correct.

2    Q.    And you're inferring from what you understood

3          or recall of the general naming process that

4          -- let's go off the record for a minute.

5                VIDEOGRAPHER:   The time is

6          10:25 a.m.  We're going off the record.

7                (Brief pause.)

8                VIDEOGRAPHER:   The time is

9          10:25 a.m.  We're back on the record.

10   BY MR. JACOBS:

11   Q.    Your recollection is that you had a naming

12         process at SolidWorks that included

13         consultation with counsel, is that correct?

14   A.    Correct.

15   Q.    And, therefore, although you don't have a --

16         you don't remember now what happened with

17         Ms. Stratford, you believe that you would have

18         had an interaction with her about the

19         permissibility of this choice?

20   A.    Myself or someone involved in the process

21         would have had it.

22   Q.    And, indeed, you chose DWGeditor as the name?

23   A.    Correct.  Well, I recommended the name, I

24         didn't -- the final decision was not mine.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.770.3363
Facsimile: 415.591.3335

Suite 1100
44 Montgomery Street
San Francisco, CA 94104
www.esquiresolutions.com

53

1    Q.    The company chose DWGeditor as the name.

2    A.    Okay.

3    Q.    Do you infer from that that Ms. Stratford

4          approved that choice?

5                MS. ROBERTS:   Objection.   Calls for

6          speculation.

7    BY MR. JACOBS:

8    Q.    Go ahead.

9    A.    I will assume that the process was followed.

10   Q.    Well, did the process allow business people to

11         override a legal conclusion?

12   A.    Not to the best of my knowledge.

13   Q.    So having chosen the name, your -- the

14         inference you draw is that Ms. Stratford

15         approved it?

16               MS. ROBERTS:   Objection.   Calls for

17         speculation.

18               THE WITNESS:   I'm not sure how to

19         answer that.   All I know is that I am assuming

20         that the process was followed as part of the

21         -- the due diligence they go through to launch

22         the product.

23   BY MR. JACOBS:

24   Q.    And as you sit here today, do you have any



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.770.3363
Facsimile: 415.591.3335

Suite 1100
44 Montgomery Street
San Francisco, CA 94104
www.esquiresolutions.com

54

1      recollection that you're not testifying about
2      about the interaction with Ms. Stratford?
3  A.  Please repeat that.
4  Q.  As you sit here today, do you have any memory
5      of the back and forth with Ms. Stratford on
6      this issue?
7  A.  No.  I do not.
8           MS. ROBERTS:   Objection.   Lacks
9      foundation.
10 BY MR. JACOBS:
11 Q.  Now, in the next paragraph -- the next
12     paragraph is "Non-English AutoCAD support."
13          Do you see that?
14 A.  Yes.
15 Q.  And it says, among other things:   "To that
16     end, we will need access to AutoCAD in these
17     languages so we can determine what localized
18     keywords AutoCAD uses.  Do they have these in
19     house?  If not, what is our procedure for
20     getting them?"
21          Do you see that?
22 A.  Uh-huh.
23 Q.  What was that all about?
24 A.  There is the -- let me think of the best way



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.770.3363
Facsimile: 415.591.3335

Suite 1100
44 Montgomery Street
San Francisco, CA 94104
www.esquiresolutions.com

170

1    COMMONWEALTH OF MASSACHUSETTS )

2    SUFFOLK, SS:                  )

3

4         I, JANE M. BORROWMAN, Registered Professional

5    Reporter and Notary Public in and for the Commonwealth

6    of Massachusetts, do hereby certify that on September

7    22, 2009, ROBERT NOFTLE, the witness whose deposition

8    is hereinbefore set forth, was duly sworn by me and

9    that such deposition is a true record of the testimony

10   given by the witness.

11        I further certify that I am neither related to or

12   employed by any of the parties in or counsel to this

13   action, nor am I financially interested in the action.

14        In witness whereof, I have hereunto set my hand

15   and seal this 4th day of October 2009.

16

17    /s/ Jane M. Borrowman

18                  Notary Public

19                  RPR No. 001420

20

21

22   My commission expires:

23

24   28 September 2012

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.770.3363
Facsimile: 415.591.3335

Suite 1100
44 Montgomery Street
San Francisco, CA 94104
www.esquiresolutions.com