MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
J. THOMAS MCCARTHY (CA SBN 034728)
TMcCarthy@mofo.com
DAVID E. MELAUGH (CA SBN 219477)
DMelaugh@mofo.com
LYNN M. HUMPHREYS (CA SBN 168062)
LHumphreys@mofo.com
JACQUELINE BOS (CA SBN 243938)
JBos@mofo.com
NATHAN B. SABRI (CA SBN 252216)
NSabri@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for Plaintiff
AUTODESK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AUTODESK, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>DASSAULT SYSTÈMES SOLIDWORKS CORPORATION, a Delaware corporation,<br><br>Defendant. | Case No.   3:08-cv-04397-WHA<br><br>**AUTODESK'S OPPOSITION TO SOLIDWORKS' MOTION IN LIMINE NO. 5 TO PRECLUDE TESTIMONY AND EVIDENCE BY DR. E. DEBORAH JAY**<br><br>Date:    December 30, 2009<br>Time:    9:00 a.m.<br>Place:   Courtroom 9, 19th Floor<br>Judge:   Hon. William H. Alsup |

## I. INTRODUCTION

Despite losing the functionality argument on summary judgment, SolidWorks nonetheless tries to re-introduce the issue in its motion to exclude Autodesk's secondary meaning survey. Relying on inapposite trade dress authorities regarding functional features, SolidWorks ignores the Court's determination that Autodesk's DWG word mark is not functional. Next, SolidWorks tries to argue that Autodesk cannot introduce evidence of secondary meaning without first proving non-genericness. That is not what the law requires, and courts have found secondary meaning surveys relevant to a genericness analysis. Finally, as an experienced survey expert, Dr. Jay is entitled to present her interpretation of the survey results, including what would have been the likely results had respondents associated DWG with Autodesk for so-called functional reasons, as SolidWorks tries to contend. Accordingly, the Court should deny SolidWorks' motion in limine No. 5.

## II. FACTUAL BACKGROUND

Autodesk's survey expert, Dr. Deborah Jay, is President and CEO of Field Research, an established, respected marketing and public opinion firm. (Decl. of Jacqueline Bos in Support of Autodesk's Opp'n to SolidWorks' Mot. in Limine No.5 ("Bos No. 5 Opp. Decl."), filed herewith, ¶ 2, Ex. 1 (Sept. 24, 2009 Expert Report of E. Deborah Jay ("Jay Rpt.")) ¶ 10 & Ex. A at 1-5.) She has more than 25 years of experience conducting large scale surveys for public agencies, companies and law firms, and has qualified as an expert in numerous trademark cases. (*Id.*, Ex. A at 3.)

Between November 2005 and January 2006, Dr. Jay conducted a survey to determine whether design software decisionmakers associated "DWG" with design software from a single company or source, and, if so, whether they associated it exclusively with Autodesk and/or AutoCAD. (*Id.* ¶ 2.) This time period is important because it is relatively close in time to when SolidWorks first introduced its DWGseries products, the relevant time period for the genericness inquiry.[1] (By contrast, SolidWorks' own so-called genericness survey was not conducted until August 2009.)

Dr. Jay supervised a telephone survey of 308 design software decisionmakers in companies from among three industry groups: (a) engineering/architectural/ surveying; (b) manufacturing; and

---

[1] The parties have stipulated that, for example, SolidWorks released DWGeditor in August 2004 and released DWGgateway in January 2005.

(c) construction.  (*Id.* Ex. A at 6-7, 10-11.)  SolidWorks' motion does not challenge Dr. Jay's survey universe or screening procedures.  Once respondents met the screening criteria, they were asked two sets of questions.  The first set (the "test questions") pertained to DWG:

> My next question concerns the name or term 'DWG.'  Do you associate the name or term 'DWG' with <u>design software</u> from any particular company or companies?
>
> - (*IF YES)* "With what company or companies?"
>
> - (*IF DIDN'T KNOW COMPANY NAMES)* "Do you associate the name or term 'DWG' with <u>design software</u> from one company or more than one company?

(*Id*. Ex. A at 10 (emphasis in original).)  The other, control questions were identical except they used a fictional control, "QBK."  SolidWorks' motion does not question Dr. Jay's control choice.

Dr. Jay found that, when asked the "test" questions, 43% of decisionmakers said they associated DWG with design software from a single company or source (42% said they associated it with design software from Autodesk and/or AutoCAD exclusively and 1% said they associated it with design software from one company but did not know the company name).  (*Id.* Ex. A at 13.)  By contrast, when asked the control questions, none of the decisionmakers said they associated QBK with design software from Autodesk or AutoCAD, and none said they associated it with design software from one company but did not know the company's name.  (*Id.*)

The results are even more striking when one looks only at the responses in the two industry groups that SolidWorks' own survey expert acknowledges are more relevant in this case, namely the engineering/architectural/surveying and manufacturing groups.[2]  There, more than half (54%) of the decisionmakers in these companies associated DWG with design software from a single company or source.  (52% said Autodesk and/or AutoCAD exclusively and 2% said they associated it with design software from one company but did not know the company's name.)  (Jay Rpt Ex. A at 14.)

### III.   ARGUMENT

#### A.   Consumer Recognition of DWG as AutoCAD's Proprietary File Format is Precisely the Issue in This Case

In a re-hash of its summary judgment arguments, SolidWorks tries to argue that "Dr. Jay's

---

[2] Bos No. 5 Opp. Decl. ¶ 3, Ex. 2 (Marylander Dep. Tr.) at 98:5-9 (SolidWorks told Marylander that "SolidWorks did very little in the construction industry.").

survey is irrelevant in its entirety because it fails to distinguish between .dwg as a functional file format, which Autodesk has disclaimed any right to, and DWG as a brand for Autodesk's alleged proprietary technology." (SolidWorks' Mot. In Limine No. 5 ("Mot.") at 2.)  Again, however, SolidWorks' arguments fail because they miss the point.

First, SolidWorks mischaracterizes what Autodesk has "disavowed."  As the Court made clear in its rulings on summary judgment, Autodesk "expressly disavows any ownership of 'any even arguably functional use of DWG' (Br. 3), including the use of DWG as a *file extension*. . . . [A]nyone [in] the world is free to use '.dwg' as a file extension as far as Autodesk is concerned.  Thus, there is no concern that plaintiff will obtain a monopoly over the .dwg file extension and prevent its use in the industry." (MSJ Order (D.I. 195) at 7-8.)  Autodesk has not, however, disavowed trademark rights in DWG to identify its proprietary *file format*.  Rather, it is (and always has been) willing to allow others to use the letters .dwg as a file extension to indicate to computers that a file follows Autodesk's proprietary DWG format, in the same way that word marks *used in computer code* permitted compatibility in *Compaq Computer Corp. v. Procom Tech., Inc.*, 908 F. Supp. 1409 (S.D. Tex. 1995), and *Sega Enterprises v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992).

Second, SolidWorks' reliance on citations to Professor McCarthy's treatise and *Straumann Company v. Lifecore Biomedical Inc.* is misplaced.  As in summary judgment, SolidWorks points to a treatise discussion addressing a different situation—*validity of trade dress*.  In that instance, courts have said that customer recognition cannot overcome functional status.  2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15.23 (4th ed. 2009) ("McCarthy").  Likewise, *Straumann Company* involved a design for dental implants that included both functional and non-functional elements, and the court said that "evidence of secondary meaning must distinguish between functional features which are not subject to protection and non-functional features which may be protected." 278 F. Supp. 2d 130, 137 (D. Mass 2003).  The court found that a survey measuring only consumers' perception of the implant overall was not relevant to whether the individual features of the plaintiff's implant had achieved secondary meaning.  *Id*.  And *Straumann Company* found an additional fatal flaw in the survey, namely that the question "*What company* do you think puts out these products?" presumed "the existence of the key element in a secondary

meaning inquiry, namely the association of the design with a *single* source." *Id.* at 138. As set forth in Section III.B. below, Dr. Jay's survey does not make this mistake.

Here, the Court has already determined that Autodesk's DWG word mark is not functional. (MSJ Order at 9.) Moreover, the strength and customer recognition of DWG can legally come from any type of exposure that Autodesk creates – either as part of advertising or as attached to a file name. *See*, *e.g.*, *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001) (analyzing priority of trademark rights using "totality of the circumstances test"). Customer recognition that comes as a result of seeing DWG as part of a file name is not as a result of a "functional" usage. "Functional" usage of DWG occurs only when a computer uses the letters to recognize a file.

Finally, SolidWorks again mischaracterizes the Trademark Office proceedings on Autodesk's DWG applications. The "U.S.P.T.O" did not "reject" the Jay survey, as SolidWorks suggests. (Mot. at 4.) Rather, SolidWorks cites to a non-final office action reflecting the opinion of a single examiner who cites no authority for his positions regarding file formats. This was not a final decision from the Trademark Trial and Appeal Board and therefore not a final determination on either the registrability of DWG or the relevance of Dr. Jay's survey results. *See* Autodesk's Mot. in Limine No. 2.

**B.     The Jay Survey is Relevant to Show That DWG is Not Generic**

The Ninth Circuit has explained that where "buyers understand the term as being identified with a particular producer's goods or services, it is not generic. But if the word is identified with all such goods or services, regardless of their suppliers, it is generic." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 929 (9th Cir. 2005) (internal quotations and citations omitted). SolidWorks assumes that a secondary meaning survey is irrelevant to genericness. That is neither logical nor the law. Citation to *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938), is unavailing. In that case, the U.S. Supreme Court, albeit obliquely, held that plaintiff had shown only a minority usage or de facto secondary meaning: "To establish a trade name in the term 'shredded wheat,' the plaintiff must show more than a subordinate meaning which applies to it. It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer. This it has not done." 305 U.S. at 118; *see also* 2 McCarthy § 12:47. By contrast, the Jay Survey shows the *primary* significance of DWG among consumers is of Autodesk, the producer.

It is true that the Thermos and Teflon models are the two most often used for probing the genericness issue. But courts have also found other survey formats relevant. "[S]urveys that test for secondary meaning … may yield relevant results that point towards or away from trademark significance. For example, if there is strong evidence of secondary meaning, then that is evidence that those surveyed perceive the designation as a trademark." 2 McCarthy § 12:14.[3] In *Trump v. Caesars World, Inc.*, 645 F. Supp. 1015, 1020-21 (D.N.J. 1986), *aff'd*, 819 F.2d 1135 (3d Cir. 1987), for example, Caesars offered two surveys showing "an association" between "palace" and Caesars' facility in Atlantic City. The first survey asked questions regarding the meaning of "palace," and, *inter alia*, "when specifically asked if they ever heard the word 'palace' as part of the name of a casino hotel, 45.8 percent mentioned Caesars and 11.4 percent cited Trump's." *Id.* The court found that "[t]his survey tends to negate Trump's contention that 'palace' is a generic term for accommodation and tends to support the contention that in the context of gambling activity in general palace is indicative of a source of such services." The second survey asked about the full name associated with "Caesars" and three other casinos, and the court found the results "pointed to the same conclusions." *Id.* at 1021. "[T]he surveys are a good measure of the significance of the marks 'Caesars Palace' and 'The Palace' in the minds of the gambling consumer . . . ." *Id.* Likewise here, Dr. Jay's survey showing a 54% association of DWG with Autodesk and/or AutoCAD is a good measure of the significance of the mark DWG in the minds of design software decisionmakers.

Similarly, in *Gaylord Entm't Co. v. Gilmore Entm't Group, LLC*, 187 F. Supp. 2d 926, 934-44 (M.D. Tenn. 2001), the defendant claimed that "OPRY" was a generic term. In response, the plaintiff offered, *inter alia*, survey evidence that 45.7% of the overall population associated it with a particular company, namely the "Grand Ole Opry," and that within the relevant market 60% associated 1-800-THE-OPRY with the same company. The court denied summary judgment, accepting the survey and concluding that "Gaylord has produced a significant amount of evidence that tends to establish the primary meaning of 'Opry' to the relevant public (of individuals interested

---

[3] SolidWorks' quote from Dr. Jay's article (Mot. at 4-5, citing Ryan Decl. Ex. 8) referencing Prof. McCarthy's treatise should be put in context. The cited subsection in § 12:46, reads: "'De Facto Secondary Meaning is out of place in a genericness enquiry." In that same section, Prof. McCarthy explains that "evidence of secondary meaning (such as a survey) is evidence of trademark significance and is evidence negating a genericness challenge." 2 McCarthy § 12:46.

in country and western music) is as a trade name associated with the Grand Ole Opry and Gaylord." *Id.* at 944. Here, Dr. Jay's survey results show very similar association of DWG with Autodesk and/or AutoCAD, namely 43% when looking at all three industry groups and 54% when looking at the two most relevant industries. (Jay Rpt. Ex. A at 13-14.)

SolidWorks' cases are unavailing. In *Steak N Shake Co. v. Burger King Corp.*, 323 F. Supp. 2d 983 (E.D. Mo. 2004), the plaintiff asserted trademark rights in "steakburger." In plaintiff's survey respondents were asked whether they "*most often*" identified certain terms as coming from one or more than one company. The court called this approach "indeterminate and awkward." *Id.* at 994. DWG is not like a "steakburger." And unlike *Steak N Shake*, Dr. Jay's questions did not ask "Do you associate 'DWG' with software *most often* from any particular company or companies?" Instead, her questions were like the one suggested by defendant's expert in *Steak N Shake*. *Id.* at 990. ("[A]re steakburgers sold at one restaurant or more than one restaurant, or don't you know?"). Dr. Jay asked, "Do you associate the name or term 'DWG' with design software from any particular company or companies?" (Jay Rpt. Ex. A at 10.) She gave respondents the opportunity to name more than one company associated with DWG. Yet her results plainly show that respondents primarily identified Autodesk and/or AutoCAD. Very few respondents mentioned other companies, and no single company was mentioned more than a handful of times. (Bos No. 5 Opp. Decl. ¶ 4, Ex. 3 (Jay Dep. Tr.) at 42:23-44:24; *Id.* ¶ 5, Ex. 4 (Jay Dep. Ex. 1452).)

Likewise, SolidWorks' citation to *Big Island Candies, Inc. v. The Cookie Corner* is inapposite. First, it involved a trade dress survey, where consumers were shown pictures of plaintiff's cookie wrapped with plaintiff's name and asked "Who makes this product?" 269 F. Supp. 2d 1236, 1250 (D. Haw. 2003). Not surprisingly, "more than one respondent stated that they 'recognized' the BIC Cookie because they read the name of the producer on the wrapper." *Id.* Second, significantly less than a majority of respondents (17%-29%) identified plaintiff, and therefore did not meet the "majority rule." *Id.* at 1250-51. Third, the plaintiff's survey expert specifically testified that the survey did not test for either genericness or secondary meaning. *Id.* None of those defects are present in the Jay Survey: 54% of respondents in the more relevant industries associated DWG with design software from a single company or source.

SolidWorks argues that "for a party in Autodesk's position to prevail, it must show that the primary significance of DWG is non-generic" and by a "majority rule." (Mot. at 6.) The Jay survey does exactly that. It shows that, among customers in the more relevant industries, 54% perceive DWG as a mark, which is evidence that the primary significance of DWG is non-generic.

### C. Dr. Jay's Testimony Is Based on Sufficient Facts or Data

Finally, SolidWorks complains that Dr. Jay may "speculate . . . that if users associated dwg with Autodesk for functional reasons, they would have associated it with other companies." (Mot. at 7.) SolidWorks' reference to Autodesk's supposed "71% of the 2D CAD market share," is misleading because it ignores the fact that Dr. Jay's survey addressed consumers of design software in both the 2D and 3D markets, where SolidWorks claims market strength. (Bos No. 5 Opp. Decl ¶ 4, Ex. 3 (Jay Dep. Tr.) at 177:24-178:9.) Moreover, interpretation of survey results and logical conclusions from them is within the purview of a qualified survey researcher such as Dr. Jay. *See, e.g., Schmidt v. Quigg*, 609 F. Supp. 227, 230 (E.D. Mich. 1985) (where survey indicated respondents expected product to be available only from plaintiff, survey supported non-genericness, as respondents could be expected to identify multiple sources if product was in fact generic). Similarly here, as Dr. Jay explained, if the survey results are based on so-called "functional" reasons as a file extension, she would have expected respondents to associate DWG with multiple companies whose product can open and save files in Autodesk's DWG format. (*See* Bos No. 5 Opp. Decl. 4, Ex. 3 (Jay Dep. Tr.) at 128:17 to 129:13.) They did not. Because her testimony does rely on sufficient facts and data, her testimony should properly be admitted.[4]

### IV. CONCLUSION

For the reasons stated above, the Court should deny SolidWorks' Motion in Limine No. 5 and admit the report and testimony of Dr. Jay regarding her survey.

Dated: December 22, 2009           MORRISON & FOERSTER LLP

By:  /s/ *Michael A. Jacobs*
         MICHAEL A. JACOBS
Attorneys for Plaintiff AUTODESK, INC.

---

[4] The mere conclusory objection based on speculation and hearsay (Mot. at 7) must be denied.